**FILED**

DISTRICT COURT OF GUAM

AUG 1 2 2005

MARY L.M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

\* \* \*

UNITED STATES OF AMERICA,     ) COURT OF APPEALS
                              )      CASE NO.
              Plaintiff,      )
                              )
     vs.                      )  CASE NO. CR01-00033
                              )
ROBERT C. LEONES,             )
                              )
              Defendant.      )
_____)

TRANSCRIPT OF PROCEEDINGS

BEFORE

THE HONORABLE CONSUELO B. MARSHALL

Designated District Judge

**SENTENCING HEARING**

**TUESDAY, AUGUST 9, 2005**

1    **APPEARANCES:**

2

3    FOR THE PLAINTIFF:

4    UNITED STATES ATTORNEY
     BY:  FREDERICK A. BLACK, Esq.
5    Assistant United States Attorney
     Suite 500, Sirena Plaza
6    108 Hernan Cortes Avenue
     Hagatna, Guam  96910
7

8

9    FOR THE DEFENDANT:

10   TEKER TORRES & TEKER, P.C.
     Attorneys At Law
11   BY:  PHILLIP TORRES, Esq.
     130 Aspinall Avenue, Suite 2A
12   Hagatna, Guam  96910

13

14

15

16

17

18

19

20

21

22

23

24

25

1       HAGATNA, GUAM; TUESDAY, AUGUST 9, 2005; 4:05 P.M.

2                              * * *

3              THE CLERK:  Criminal case 01-00033, United

4       States of America versus Robert C. Leones, sentencing.

5              Counsel, please state your appearances.

6              MR. BLACK:  Yes, Your Honor, Fred Black for

7       the United States.  To my left is Erwin Fejeran, who's

8       a task force agent assigned to ICE, the former

9       Immigration and Customs Enforcement, and he is also the

10      one that has worked primarily with the defendant for

11      the past two years.

12             THE COURT:  Good afternoon.

13             MR. TORRES:  Good afternoon, Your Honor,

14      Phillip Torres appearing for the defendant, who is

15      present.

16             THE COURT:  Good afternoon.

17             The matter before the court this afternoon

18      is sentencing.  And I've had a conversation with the

19      probation officer before taking the bench just to make

20      sure that I had all the information that I needed for

21      purposes of imposing the sentence.

22             I've reviewed certain documents and I'll

23      identify those for the record, and if I fail to

24      identify something that has been filed in the case

25      that the court should consider, please bring it to

my attention:  The presentence report, the final

submission date, July 15, 2005; the government's

statement adopting findings of the presentence report,

this document was filed on May 2nd of 2005; there's an

addendum to the presentence report, dated July 15,

2005.  And the addendum probation indicates that

defense counsel has not filed a response to the

presentence report as of that date, that is July 15,

2005.  The United States adopted the presentence

report, and that was the document that I just referred

to.  And the probation officer indicates defendant's

financial situation has changed, does not have the

ability to pay a fine.

The court also has the sentencing

recommendation letter dated July 15, 2005; this is the

letter where probation calculates the guidelines range

and indicates its recommended sentence to the court,

the term of supervised release and the terms and

conditions of that probation recommends should be

imposed.

Let me ask, both sides have seen the July 15,

2005 recommendation letter?

MR. BLACK:  Yes, Your Honor.

MR. TORRES:  Yes, Your Honor.

THE COURT:  So these conditions, if the court

1   should impose those conditions, that would come as no

2   surprise to the defendant because defense counsel has

3   seen the document and also discussed it with his

4   client; correct?

5           MR. TORRES:  Yes, ma'am, that's correct.

6           THE COURT:  Then the court has the plea

7   agreement in the case, this is a document that was

8   filed March 30th, 2001; the indictment which was filed

9   March the 28th, of 2001.  And the court has reviewed

10  the government's motion for a downward departure

11  pursuant to 5K1.1.

12          And those are the things that I have read and

13  have considered for purposes of sentencing.  Is there

14  anything else that was filed with the court that I did

15  not mention that should be reviewed?

16          MR. BLACK:  Not for the government, Your

17  Honor.

18          MR. TORRES:  No, Your Honor.

19          THE COURT:  All right.  So at this time the

20  court is prepared to hear from defense counsel.

21          MR. TORRES:  Your Honor, we are here for

22  sentencing of Robert Leones, and I have personally

23  known Robert Leones since March 28th of 2001 when I

24  was appointed to represent him.  He would like to

25  address the court later.

1          THE COURT:  And I will give him that

2     opportunity.  I'll hear from defense counsel,

3     government's counsel, and then from defense counsel

4     again in the event the government says anything to

5     which you feel you need to respond, and then I'll hear

6     from the defendant last so that he can respond to

7     anything that may be said by anyone here in the

8     courtroom.

9          MR. TORRES:  Thank you, Your Honor.

10          I'd like to point out what I know that I would

11     like to tell the court about the defendant that I would

12     like the court to consider in its final decision on the

13     sentence in this case.  When I met him back in March of

14     2001, I felt that I was meeting somebody who was rather

15     confused, somebody who had very long hair; the

16     photograph in the presentence report is the likeness

17     that he had at that time.  And I thought he had done

18     a very stupid thing, and I told him that.

19          We talked about what he was being charged

20     with, what he had been indicted on, and his co-

21     defendant, and we discussed his options.  We also

22     discussed his life situation at that time.  Shortly

23     thereafter we agreed to enter -- he agreed to enter

24     into a plea agreement with the government, to plead

25     guilty and to assist the government.  The individual

1    that he was indicted with did not agree to do that,

2    ultimately was sentenced in October of 2001 to ten

3    years and one month, plus conditions.

4         In that plea agreement he agreed to help the

5    government.  And I'm sure that there are many people

6    that come before you and have over the years who have

7    agreed to do so, and maybe they do a little, maybe they

8    do a little bit more.  This is probably one of the more

9    unusual cases because we've been four years of

10   cooperating with the government and -- before bringing

11   the matter to you for sentencing.

12        I think it's important to understand who he

13   was back in 2001.  He was a person who had two

14   children, two girls, one three years old that lived

15   with him and his girlfriend, who is now his wife, and

16   one who was nine years old.  And I think he probably

17   looked at drugs as an easy way to make a few bucks and

18   help take care of some bills, and I think he also -- in

19   fact, I know that he regrets those decisions.  And,

20   ironically, I think the arrest in this situation has

21   led to a lot of positive change in his life.

22        When we entered in the plea agreement and

23   were looking -- I realized we were looking at a

24   ten-year sentence under the guidelines as they existed

25   at that time, I told the Assistant U. S. Attorney, who

1  was Mark Kondas at the time, that what we wanted to do

2  was do all we could so that one day when it came time

3  for sentencing, that he would not be sentenced to time

4  in jail, perhaps just time served.  The time served

5  that he has is 16 days in this case.  That's still our

6  hope.

7          And we have done, and Mr. Leones has done

8  everything the government has asked him to.  He, as

9  part of his pretrial release conditions, had certain

10  reporting requirements that were ongoing and

11  continuous, never violated those; he had drug testing

12  requirements where he was tested countless times and

13  never violated those.  He was asked to put himself in

14  dangerous situations; he wore a wire more than 20

15  times.  He at one time had a gun pointed at him.  He

16  basically did all that he was asked, all that he could

17  do in this case.  Because of his involvement with the

18  government, it has led to eight arrests, as noted in

19  the downward departure motion of the government.  It

20  has resulted in a seizure of almost 600 grams of ice.

21          The motivation earlier on was his two

22  daughters, I think, and his relationship with his

23  girlfriend at the time.  And he wanted to be able to

24  be a part of their lives and to see them grow through

25  the various stages that they were going to go through,

1  and I think he understood that if he didn't do all he

2  could, he wasn't going to see them go through their

3  graduation, that he would miss out of many of those

4  precious moments that you can never recapture in a

5  child's life.

6       Mr. Leones currently works at the Yigo mayor's

7  office; it used to be a part-time position but it's now

8  a full time position.  As part of that, as recreation

9  coordinator, as part of his job duties, he was a coach

10  in what we have on Guam called the Shell Oil, Shell

11  Drug Free Basketball Program.  I didn't realize that

12  until today.  But one of the things they do, and they

13  have almost 200 kids in this program, children in grade

14  school, and children in middle school, and they counsel

15  them on how bad drugs are, they do it at practice, they

16  do it before games.  He's somebody with a unique

17  ability to know what he's talking about, although I'm

18  not certain that's communicated to them.  But he is a

19  part of that program.  If he was to be sentenced to

20  time served with supervised release, he would not have

21  to lose his job at the Yigo mayor's office.

22       I'm sure that everybody comes to you, most

23  people come to you and are asking for the most lenient

24  of sentences, but in this case, I believe that time

25  served and supervised release is warranted under what

1    he has done. And I think that the government, if they

2    were to be asked directly, would they be upset if their

3    recommendation of 18 months wasn't followed and he did

4    receive time served, I don't think they would have a

5    problem with that.

6           Mr. Leones made a big mistake; he's done all

7    he could to correct it. He agreed to cooperate, he

8    meant it at the time, and did everything that was asked

9    of him. I hope the court takes that in consideration.

10   Thank you.

11          THE COURT: A couple of questions by the

12   court. The age of the daughters?

13          MR. TORRES: They are currently --

14          THE COURT: Present age.

15          MR. TORRES: -- 13 and 9, Your Honor -- 13 and

16   7, I'm sorry. 13 and 7.

17          THE COURT: And they reside with their mother?

18          MR. TORRES: The 7-year-old resides with the

19   defendant and his wife, and the older girl resides with

20   her mom. But he does support her, by the way.

21          THE COURT: And so the two girls would be

22   taken care either by the biological mother or by the

23   wife of the defendant if the defendant were not there

24   to care of the girls?

25          MR. TORRES: They both have biological

1    mothers.

2         THE COURT:  Okay.  Describe what you believe

3    to be the defendant's role in the offense, and how

4    many other defendants or how many other persons were

5    involved in the particular transaction that's the

6    subject of the indictment for which we are here to

7    sentence today.

8         MR. TORRES:  As I understand it, he was

9    somebody who used to use drugs in the early, mid-90's,

10   it was the drug ice, and then stopped, and then met

11   somebody in 2001 who was a considerable player in the

12   importation and distribution of drugs; he was

13   approached and asked if he would help and he agreed

14   that he could sell them.  And on one occasion these

15   drugs arrived on island, were seized by the government,

16   they used the drug Clue to mark them, he was at that

17   residence where they were delivered, and when they were

18   delivered the government came and arrested everybody

19   who was in the house and he was one of the individuals

20   in the house.

21        THE COURT:  He was asked if he would help, he

22   indicated yes.  What was his motivation for helping?

23        MR. TORRES:  He was going to be somebody who

24   was going to help distribute them locally.  They were

25   going to sell it to him for $250 and he was going to

1     try and sell it for $300.  His motivation was trying

2     to make $50 a gram.

3          THE COURT:  And he was to sell it in this

4     community?

5          MR. TORRES:  In this community, yes.

6          THE COURT:  And at this time he had

7     discontinued the use of drugs?

8          MR. TORRES:  He had discontinued the use of

9     drugs until shortly before that time.  I think it's

10    important that ever since, in these four years and all

11    the tests he has taken, he's never once tested positive

12    or been in violation of his pretrial release

13    conditions.  But yes, to answer your question, the

14    answer is yes.

15         THE COURT:  So what he agreed to do was to

16    help distribute the drugs in this community, but it

17    didn't get that far, because the drugs were seized

18    prior to him getting it in his hands; is that correct?

19         MR. TORRES:  That's correct.

20         THE COURT:  And how long had he been using

21    drugs?  And if you think he can better answer this

22    question than you, then I'll certainly let him answer

23    it.  How long have you been using drugs again at the

24    time that this event occurred?

25         MR. TORRES:  It's my understanding it had been

```
 1    a few months, and I think that was consistent with
 2    documents we executed back in his initial release.
 3            THE COURT:  And what happened that caused him
 4    to start using drugs again, if you're knowledgeable?
 5    Was there some event in his life, or what caused him to
 6    start using again?
 7            MR. TORRES:  Didn't have a job.
 8            THE COURT:  And how many other defendants, if
 9    there were other defendants, were indicted as a result
10    of this transaction, to your knowledge?
11            MR. TORRES:  I think there might have been
12    four people in that house at the time, but he was
13    indicted with only one other person.
14            THE COURT:  Okay.  And I guess you probably
15    feel the government can best describe their respective
16    roles.
17            MR. TORRES:  Yes, I think so.
18            THE COURT:  Okay.  All right, I have no
19    further questions.
20            MR. TORRES:  Thank you, Your Honor.
21            THE COURT:  Thank you.
22            Government's counsel?
23            MR. BLACK:  Yes, Your Honor.  The defendant's
24    role in this case was kind of as an assistant to a
25    major distributor of methamphetamine and a major
```

1    importer, the co-defendant by the name of Monton, who

2    was convicted, pled guilty partly as a result of this

3    defendant's cooperation.

4         The government, as you can see in our motion

5    for downward departure, is recommending no more than

6    18 months.  We'd leave it to the sound discretion of

7    the court, as always, what particular sentence should

8    be imposed.

9         The government is somewhat in a difficult

10   position, because we get very close to these defendants

11   having worked with them over a period of years, the

12   agent is very close to them.  The head of ICE, or RAC

13   of ICE is in the courtroom today, Rob Robertson, behind

14   me; he said good things about this particular

15   defendant.  I think he's here for the case that follows

16   this.

17        Certainly, Your Honor, ice is probably the

18   most destructive force that exists on Guam; robberies

19   and burglaries that happen as a result of ice use just

20   is devastating to this community.  And the ice is

21   coming both from the Philippines as well as Los

22   Angeles.  It goes to and from via the Hawaiian Islands

23   and also from the Orient, and about 50 percent comes

24   from both directions, and it sells in Guam for anywhere

25   from 300 to a thousand dollars.  In this case the going

1    rate was approximately $300 at the time.

2         The defendant's role was in a way almost like

3    a mule in a drug world.  The co-defendant, the primary

4    organizer, used this defendant to actually pick it up

5    when it was mailed in at Federal Express, and that

6    often fits the mode.  At the time this defendant was

7    25 years of age, and he was a young man and had a prior

8    addiction, and perhaps was currently addicted at the

9    time.

10        What we always tell the defendants at the time

11   is that we want their full cooperation, and we want it

12   as long as it takes; and as long as they're producing

13   results for us, we often continue the case.  In this

14   case, the entire case was sealed so that he would have

15   the benefit of being able to work on a small island

16   where it wasn't announced in the headlines of the

17   newspaper, and we found it to be a very effective

18   technique.

19        This defendant is perhaps one of the most

20   effective undercover type people that we've had for

21   years.  He produced a total of five different seizures

22   that added up to about 557 grams of methamphetamine

23   that would have come to Guam and been on the streets

24   but for his activity.  Four drug importers and three

25   local drug dealers have been convicted as a result of

1   his cooperation.  He had over 71 telephone recorded

2   calls.  As defense attorney alluded to, made numerous

3   undercover meetings in which he wore a wire.  He did an

4   excellent job for the government.  And throughout the

5   entire time period he was tested for various urine

6   testing and tested -- never tested positive the whole

7   time.  He's been employed, he's married, apparently he

8   is a good father.

9        The government is recommending no more than

10  18 months just because we know it's quite a serious

11  offense that he got involved in to begin with.  We

12  leave it to the court's discretion, of course, as the

13  court's got the power at this time to impose the

14  appropriate sentence.  Thank you.

15       THE COURT:  Defense counsel said the

16  government won't be upset if the court were to give

17  this defendant credit for time served.  And as I

18  understand it, that time is 16 days.  And I would just

19  ask, is that a correct description of the government's

20  position?

21       MR. BLACK:  I guess our official

22  recommendation is no more than 18 months.  If whatever

23  the court decided to give him, whether it was the 18

24  months, a lesser term all the way down, nobody is going

25  to be upset in this case just because of the tremendous

1   value of the defendant's cooperation.

2          And oftentimes we think in terms of

3   deterrence, deterring other people, but there's another

4   message sent as well; when a person really does

5   everything he's supposed to do, wears a wire, works

6   undercover and helps stop some of the sicknesses that's

7   in this community, it's not a bad message either that

8   they get a much better treatment, and that message,

9   whether it's carried in the media or whether it simply

10  is carried via the small defense bar that we have, I

11  think the defense lawyers realize that if somebody

12  cooperates in a significant way, and very few can do

13  that because the methamphetamine is so addicting that

14  most of the people that got involved get back into it,

15  and most people that say they're going to cooperate

16  simply don't.  So this defendant, there was unreserved

17  praise for this defendant by the head of the office, as

18  well as the task force guy that worked with him.

19          THE COURT:  And in deciding how many levels of

20  departure which at least gives some guidance as to what

21  the sentence should be, and the recommendation of the

22  government, is that recommendation made after

23  consulting the two individuals who you've identified

24  who are present in the courtroom today, who have worked

25  with the defendant?

1      MR. BLACK:  Yes.  They were the ones that came

2   up with the language "no more than 18 months" to

3   recommend to Your Honor.  And then I consulted with the

4   First Assistant U. S. Attorney in my office, and he

5   grudgingly said "no more than 18 months".  But we've

6   phrased it in that term just to give the court whatever

7   latitude the court felt was appropriate.  But certainly

8   these defendants -- or these investigators that are

9   here with me are the ones that made that

10  recommendation.

11      THE COURT:  And is it based on policy of the

12  office or somebody's policy that the government has

13  recommended a departure to a level that permits the

14  government to recommend to the court no more than 18

15  months as opposed to just simply recommending credit

16  for time served if that's really the assessment that

17  you feel should be given to the case?

18      MR. BLACK:  I don't know if it's a specific

19  policy.  Every case in our office has to be run by the

20  First Assistant; he comes from Florida where they don't

21  depart as many levels.  As a prosecutor, I've always

22  just recommended a sentence based on what the agents

23  tell me because they're the ones that work closest with

24  the defendant.  Certainly there is the benefit of the

25  deterrent; some people surprise us, years later they

1   get back into it.  It's a terribly addicting drug.  So

2   there's a value of deterrence for the individual as

3   well as the community, if there is a deterrence.

4        But there's no question that this defendant

5   cooperated in an outstanding manner, and that has led

6   a very good life for the past four years.  And some of

7   that to the extent that they've had to live to a degree

8   of fear or a degree of uncertainty for four years,

9   being asked to wear a wire, some of that is actually in

10  a sense almost serving time, because they have to live

11  for a period of time in a world that isn't perfectly

12  safe for them.

13       THE COURT:  I indicated that I have read the

14  government's motion, but I did not see the memo that

15  probably accompanied this motion, so maybe government's

16  counsel can advise the court.  I have the file here on

17  the bench, and I've been looking through it, and of

18  course things are placed in the file I guess based on

19  dates when things are filed, but I have not found in

20  the file the actual memorandum where the government may

21  discuss in more detail the defendant's cooperation.

22       MR. BLACK:  And the court -- my copy is

23  actually very short.  Primarily he assisted in the

24  conviction of the co-defendant.  As a result of his

25  cooperation, agreement to testify in the case, the

1   co-defendant received the lengthy sentence that he did.

2   And then on the second page really talks in terms of

3   the number of recorded calls as well as the number of

4   seizures, the 557 grams, approximately five different

5   seizures, four drug importers, three local drug

6   dealers, and numerous undercover meetings and things of

7   that sort.  So it's relatively short, but that's a copy

8   of it, Your Honor.

9           THE COURT:  And you indicate here, and I think

10  you indicated orally that there were four drug

11  importers who were arrested and convicted as a result

12  of cooperation given?

13          MR. BLACK:  That's true, Your Honor.

14          THE COURT:  And three of those are local Guam

15  drug distributors?

16          MR. BLACK:  That's true, Your Honor.

17          THE COURT:  Defendant did not testify in any

18  of the cases, and I assume that's because none of them

19  went to trial so his testimony wasn't needed?

20          MR. BLACK:  I believe that's the case.  I

21  don't have all the specifics that were between two

22  different agencies; DEA did some of these cases and

23  Customs did the others.  The Customs people are here

24  and could answer any of those questions.  But I believe

25  that since the undercover meetings were recorded and

 1    things of that nature, the defendants all pled guilty.

 2    I don't think he was required to testify.

 3            (Turning to agent.)  Is that true?

 4            He didn't have to testify.  He was prepared to

 5    testify, but he did not have to testify.

 6            THE COURT:  That was going to be my next

 7    question.  It's your belief that if it had been

 8    necessary for him to testify, he would have testified?

 9            MR. BLACK:  That's true, Your Honor.  And it's

10    very likely that the people that he did controlled buys

11    with and things of that sort knew that he was

12    cooperating at some point in time.  That's part of the

13    reason they pled guilty.

14            THE COURT:  Now, had it been necessary for the

15    defendant to testify, that would have been one other

16    factor that probably the government agents would have

17    taken into consideration in making a recommendation to

18    the court.  Is it your belief the recommendation would

19    have been different, in other words, you would have

20    requested a departure level even greater had the

21    defendant actually testified, or is it your belief that

22    whether he testified or not, since he was willing to do

23    so, the recommendation in terms of the levels of

24    departure would have probably been the same?

25            MR. BLACK:  It would be the latter, Your

      1  Honor.  We give him the full benefit of being prepared
      2  to cooperate, including testifying which was his
      3  commitment to us.  He wore the recordings -- he did the
      4  recordings, he wore the wires.  We have no reason to
      5  believe he would not have testified.  And whether he
      6  ultimately had to testify or not, we assume that he
      7  would have.  And so, most defendants do end up pleading
      8  guilty but we like to give them the benefit of whether
      9  he had to testify or not.
     10      THE COURT:  And is it your belief that he
     11  would have testified in each of these cases that you've
     12  described, which in my count, if I'm -- well, maybe I
     13  don't know how to count it -- but if each of these
     14  cases had gone to trial, he had been called to testify,
     15  the number of cases in which he testified, would it be
     16  five?
     17      MR. BLACK:  I think the numbers of cases, some
     18  of the defendants were together, but there were seven
     19  total defendants; whether they would have been severed
     20  at times of trials or not, I don't know, but he would
     21  have been prepared to testify with regard to seven
     22  individuals.
     23      THE COURT:  And that includes the one
     24  defendant who was given the mandatory minimum of 120
     25  months, the one who's described as the co-defendant?

1      MR. BLACK:  That's true, Your Honor.

2      THE COURT:  Okay.  Could you -- you may not

3  know, but just trying to know a little bit more about

4  those defendants who pled, and the court is curious

5  about their criminal history and whether they were

6  previously involved in drug activity and how the

7  government would have classified them.  Do you see them

8  as big drug dealers, or were they were mules, or how

9  would you classify them?

10      MR. BLACK:  Perhaps the agent could answer.

11      THE COURT:  All right, if you'll step forward

12  and state your name for the record, and then if you

13  could just answer the question.

14      AGENT ROBERTSON:  Your Honor, my name is

15  Robert Robertson, I'm the resident agent in charge for

16  Immigration and Customs Enforcement here on Guam.

17      I can't speak to the DEA cases, but I can

18  speak to the co-defendant in the original case

19  resulting in the arrest of Robert Leones, a gentleman

20  named Arnold Monton, who law enforcement on the island

21  had been after for a very long time, whose name

22  appeared repeatedly in significant drugs

23  investigations.  So we were very fortunate in that

24  particular case that the threat of Robert Leones'

25  testimony resulted in his plea and his conviction.

1    THE COURT:  So how would you describe him if

2  you had to describe him in terms of drug dealing, heavy

3  drug dealer or significant or --

4    AGENT ROBERTSON:  Certainly a significant, a

5  major player here on Guam at the time, and for a long

6  time.

7    THE COURT:  And had he been previously

8  convicted and served a sentence, or do you know?

9    AGENT ROBERTSON:  I don't recall Arnold

10 Monton's criminal history.

11   THE COURT:  And so that was the named

12 co-defendant in the case, so he's the only one that

13 you're able to address; correct?

14   AGENT ROBERTSON:  Yes.

15   THE COURT:  The other persons who are

16 mentioned in the government's sentencing memorandum,

17 your agency wasn't involved with those?

18   AGENT ROBERTSON:  No, Your Honor.

19   THE COURT:  The DEA was the agency involved?

20   AGENT ROBERTSON:  Yes, Your Honor.

21   Your Honor, if I could just add one thing?

22   THE COURT:  Sure.

23   AGENT ROBERTSON:  I wrestled with my

24 recommendation on Robert Leones, keeping in mind my

25 sense of obligation of fairness to other defendants

1    that we encounter, consequently the phrasing of my

2    memo to the Assistant U. S. Attorney. That was my

3    professional recommendation. My personal hope is that

4    Robert Leones walks out of here with probation.

5          THE COURT: Even though the credit -- I mean

6    the time that he served was only 16 days?

7          AGENT ROBERTSON: Yes, Your Honor.

8          THE COURT: Maybe you could just explain for

9    this record why you think that's adequate, an adequate

10   sentence for this defendant. And the government I

11   think alluded to it that maybe one sees the cooperation

12   of this defendant as being as difficult for him

13   personally as if he had actually been in custody at the

14   time just awaiting trial and sentence, but I'll let you

15   express it.

16         AGENT ROBERTSON: Certainly it's difficult on

17   cooperating defendants who, for the length of time

18   involved in this case, several years, to be out there

19   on the street knowing that at any time the cooperation

20   or the information that they provide to law enforcement

21   could necessarily leak back into the community but

22   could cause the community or the criminal community on

23   the island to realize that, hey, there's no place other

24   than from this individual that that information could

25   have come from resulting in my arrest. So he's

1    certainly had to live with that.

2              And in the process of doing that, he did a

3    180-degree turn in the way he handled his life, and

4    certainly everybody in my office recognizes that.  We

5    all personally like Robert Leones, we wanted to find

6    a way to get him the opportunity to cooperate at such

7    a level that we had no problem coming in here and

8    recommending probation.  It was just the nature of his

9    position in society and kind of being on the fringe of

10   the criminal community and not in the heart of it that

11   kind of prevented that opportunity.  But had it been

12   presented to him, I have no doubt that he would have

13   jumped at the chance.

14             THE COURT:  Thank you.

15             AGENT ROBERTSON:  You're welcome.

16             THE COURT:  Anything else that either the

17   government's counsel or the agent wishes to place on

18   the record for the court's consideration before the

19   court imposes sentence?

20             MR. BLACK:  Just briefly, to add to what the

21   agent said.  At the time I was the United States

22   Attorney, I had been the United States Attorney for

23   about 12 years.  At that time the standard advice that

24   I gave when this case was busted, or all the drug cases

25   were busted, that we would sit down with the defendant

1    and the defense attorney and say, the people you have

2    to convince are these agents, because at the time of

3    sentencing we will proudly recommend to the judge

4    whatever they recommend to us.  So, that just kind of

5    is to underscore the importance that we, the value we

6    put in the agent's feeling about a case.

7              THE COURT:  Thank you.

8              Defense counsel have anything further to

9    place on the record before the court hears from the

10   defendant?

11             MR. TORRES:  Your Honor, I think the court

12   has asked some great questions here, and has been

13   enlightened as to what the official position of the

14   government is, and what their desires may be.  And

15   unless you have more questions of me, I have nothing

16   to add.

17             THE COURT:  I have no additional questions.

18             The defendant may step to the lectern.  And

19   you do have a right to be heard, sir, before the court

20   imposes sentence, so I'll hear from you at this time.

21             THE DEFENDANT:  First of all, I would like to

22   say I'm very sorry.  And I know I made a big mistake.

23             THE COURT:  Sir, if you need a little time

24   before you address the court, I'll give you that

25   additional time.  The court reporter is making a record

1  of these proceedings, so we do need you to speak

2  clearly enough that she's able to take down what you're

3  saying.  So if you need a few moments to compose

4  yourself before you address the court, I'll give you

5  that time.

6          (Pause.)

7          THE COURT:  What is your present age, sir?

8          THE DEFENDANT:  I'm 29.

9          THE COURT:  And at the time that this offense

10 occurred I believe you were 25?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Okay.  What I'd like to have you

13 do is, in addition to any statement that you may wish

14 to make, and if defense counsel thinks it's

15 appropriate, is to tell me about your drug use history,

16 when you started using drugs, about that time in your

17 life that you stopped, whether you did that as a result

18 of some rehabilitation program or you just did that on

19 your own, and why it is that you started using again,

20 and then more importantly, why would you agree to sell

21 or distribute drugs in this community.  You have young

22 children of your own, and clearly we all feel very

23 strongly that they not become addicted or even

24 experiment with drugs.  So how is it that you would

25 agree to distribute such a dangerous drug as ice in the

```
 1    community in which you live, where your children are
 2    growing up, and you probably have other relatives who
 3    are young as well.  So tell me a little bit about your
 4    own drug history, how you started using drugs, what
 5    drug, and how it is that you were able to stop.
 6            THE DEFENDANT:  I started using drugs in the
 7    year '93, between '93 and 1994.
 8            THE COURT:  And how old were you at the time?
 9            THE DEFENDANT:  18, 19.  And I used it till
10    about 1996.
11            THE COURT:  So for about two or three years?
12            THE DEFENDANT:  Yeah.
13            THE COURT:  And how did you happen to start
14    using drugs, why, and tell me about that.
15            THE DEFENDANT:  I started using drugs because
16    the people I hung around with was -- they were using
17    drugs at that time.  And --
18            THE COURT:  And what was the drug that you
19    started using?
20            THE DEFENDANT:  Ice.
21            THE COURT:  So you started with ice?
22            THE DEFENDANT:  Yes.
23            THE COURT:  You used drugs then for two to
24    three years?
25            THE DEFENDANT:  Yes.
```

1        THE COURT:  And how serious was your habit at

2   that time, or how would you describe it?

3        THE DEFENDANT:  At that time I think I wasn't

4   really addicted to it, I'd use it like maybe three

5   times a month, two to three times a month.  I've seen

6   people that use, I mean, their dose is way, way bigger

7   than my own, that's why I say that I think I wasn't

8   addicted to it.

9        THE COURT:  And did you become addicted at any

10  time?

11       THE DEFENDANT:  Uhm, no.  No, Your Honor.

12       THE COURT:  And so at some point you just

13  stopped using the drug; how did that happen?

14       THE DEFENDANT:  I stopped using the drug

15  because I wanted to change.  I had a three-year-old

16  daughter and that wasn't even born and I had no job,

17  that I needed to support, so I thought that was the way

18  to make, you know, fast money.  I know it's the wrong

19  way.

20       THE COURT:  And what you're addressing now is

21  why you decided to aid in the distribution of drugs in

22  the community.  At that time you had a three-year-old

23  daughter, you weren't working you needed money to

24  support the daughter, and so you agreed that you would

25  distribute drugs in this community and you would be

```
 1    compensated for that?

 2              THE DEFENDANT:  Yes.

 3              THE COURT:  Okay.  But how is it that you --

 4    what happened in your life that caused you to stop

 5    using drugs?  Is that what you're telling me now, you

 6    stopped using because you had a three-year-old and you

 7    needed to work?

 8              THE DEFENDANT:  I just -- I wanted to just

 9    completely stop.

10              THE COURT:  And you were able to do that on

11    your own without any assistance?

12              THE DEFENDANT:  Yes.  I quit on my own for

13    about, a little more than two years, three years, I

14    quit on my own.

15              THE COURT:  So for two or three years you

16    stopped using.  And did you ever start using again?

17              THE DEFENDANT:  No, Your Honor.

18              THE COURT:  So you just agreed to distribute

19    the drugs because you needed funds?

20              THE DEFENDANT:  Yes.

21              THE COURT:  Anything else that you can tell me

22    about the why or the how of your drug history?  Or have

23    you told me everything that you can tell me about that?

24              THE DEFENDANT:  Yes.  I don't have a big drug

25    history, or --
```

1    THE COURT:  Have you done anything in this

2  community to assist the community generally, or young

3  people, to help the people understand why they should

4  not resort to the use of drugs?  Something other than

5  the cooperation that you've provided to the government.

6    THE DEFENDANT:  Your Honor, that, we had that

7  Shell Drug Free Basketball League for the kids, the

8  ages range from 6 years of age all the way up to 14.

9  And we have about 200 or maybe a little more than 200

10  kids for the Yigo, the district of Yigo, and I was one

11  of the coaches and advisors for our club.  So before

12  every practice we give 30 minutes, we talk to the kids

13  for about 30 minutes about, you know, how the drugs can

14  ruin your life and all that, alcohol, you know, it's

15  not good to smoke, everything that's bad.

16    THE COURT:  And how long have you been

17  involved with the group?

18    THE DEFENDANT:  The GYBA just started I

19  believe just this year, this is their first one, and

20  it's going to keep continuing on.

21    THE COURT:  And is it your intent to continue

22  being involved with them?

23    THE DEFENDANT:  Yes, Your Honor.

24    THE COURT:  Before you joined this

25  organization, or before you were helping the

organization before it actually commenced, were you

doing anything else in the community in the form of

counseling or working with youth or any other group of

people that you may have provided some counseling re

the use of drugs?

THE DEFENDANT: Well, the Yigo summer camp,

the Yigo youth summer camp.

THE COURT: And what is it that you did there?

THE DEFENDANT: Same thing what we did with

the basketball kids, talk about drugs and how it can

affect your life, how it can ruin your life.

THE COURT: And how long were you involved

with this group?

THE DEFENDANT: That was from, I believe June

3 to the end of June -- something -- I think the summer

camp ended on the 27th or 28th.

THE COURT: So June of what year?

THE DEFENDANT: Of 2005.

THE COURT: Any other involvement with youth

groups or other groups in the community?

THE DEFENDANT: No, Your Honor.

THE COURT: All right. Anything else that you

wish to place on the record, sir?

THE DEFENDANT: Uh, I hope I get another

chance so that I could see my children grow. And if

1 ever the government needs me, I'm still here.

2 And I would like to say again that I'm really

3 sorry. I want to apologize to the government, and to

4 my family. And that's all, Your Honor.

5 THE COURT: Sir, maybe you can describe this.

6 What has your life been like these last few years that

7 you've been cooperating or assisting the government?

8 THE DEFENDANT: It's been very scared. I

9 feared for my family.

10 THE COURT: Thank you, sir.

11 Anything else to be placed on the record by

12 anyone else before the court sentences?

13 MR. TORRES: Nothing for the defendant, Your

14 Honor.

15 THE COURT: Government?

16 MR. BLACK: Not for the government, Your

17 Honor.

18 THE COURT: Probation is seated in the

19 courtroom, and as I indicated, I did speak with the

20 officer before the court took the bench. Probation has

21 made a recommendation to the court. I don't know if

22 probation's recommendation would be the same or if

23 there's something that you'd like to place on the

24 record at this time.

25 PROBATION OFFICER GUILLIOTT: Probation has no

1    objections to the government's position on sentencing

2    in this matter, Your Honor.

3            THE COURT:  Thank you.

4            All right.  If the defendant and counsel will

5    step forward.

6            No legal cause why sentence should not be

7    imposed?

8            MR. TORRES:  No, Your Honor.

9            THE COURT:  And defendant does waive formal

10   arraignment for sentencing?

11           MR. TORRES:  Yes, Your Honor.

12           THE COURT:  As I indicated, the court has

13   read all of the documents, including the government's

14   sentencing memoranda, and the court receives them all

15   into evidence for purposes of these proceedings.

16           The presentence report prepared by the

17   probation officer considers the guidelines and makes

18   reference to them in calculating the sentence range,

19   or at least the guidelines range pursuant to the

20   guidelines.  The court is aware, of course, based on

21   the Booker decision, that the guidelines are only

22   advisory for the court, they're not mandatory, so the

23   court may impose the sentence that the court deems

24   appropriate, considering the guidelines and the advice

25   given by the guidelines.  So the court has considered

1    the guidelines and the advice that they provide.

2          In calculating a sentence pursuant to the

3    guidelines, the court would find that the base offense

4    level is 36.  A two-point increase because of the

5    importation of the methamphetamine, two-point reduction

6    for safety valve, and that provides an adjusted offense

7    level of 36.  Three-point deduction for acceptance of

8    responsibility; total offense level is 33.

9          The defendant falls into a Criminal History

10   Category of I.  And the guidelines range under the

11   guidelines would be -- one moment.

12         MR. BLACK:  135 to 168 months, Your Honor.

13         THE COURT:  Yes, 135 to 168 months, thank you.

14         This case, if not for the safety valve and the

15   government's recommendation, would carry a mandatory

16   minimum of ten years, and has been addressed here.

17   One of the defendants, the co-defendant received that

18   mandatory minimum sentence.

19         So the court has considered all those factors,

20   as well as the factors, the other factors that are in

21   the sentencing statute that suggests it's appropriate

22   for the court to consider the nature of the offense,

23   whether or not the defendant is in need of educational

24   programs, health programs, et cetera, that could be

25   provided to him if he were given a custody sentence;

1    disparity in sentencing as we look at others who are

2    similarly situated, and the sentence that they

3    received; and all of the other factors that are

4    appropriate for the court to consider.  I think they're

5    all addressed either in this presentence report or in

6    discussions that have been provided here this

7    afternoon.

8           The court has heard from, directly from one

9    of the agents involved in the case; the government has

10   indicated that it's consulted with those agents in

11   making its recommendation.  And the recommendation that

12   has been made is that the court impose a sentence for

13   no more than 18 months.  The court infers from what's

14   been said here that those who have been directly

15   involved with the defendant do not disagree that an

16   appropriate sentence in this case would be credit for

17   time served.

18          Now, the amount of time served in this case is

19   16 days.  So, to give a sentence of 16 days for such a

20   serious offense is, the court believes, quite unusual.

21   But maybe it's because those who have been directly

22   involved and know more about the case find it to be

23   quite an unusual case.  For that reason, the court is

24   going to sentence this defendant to credit for time

25   served.

1    I will be preparing a statement of reasons,

2  but in this case I'm also going to order that the

3  sentencing transcript or the sentencing proceeding be

4  transcribed and that a copy of that transcript be

5  forwarded to the Sentencing Commission along with the

6  statement of reasons and the other documents that

7  probation has the responsibility of forwarding to the

8  Sentencing Commission.

9    I'm going to try to articulate here the

10 reasons, but I think that they are best addressed in

11 those statements made by government's counsel as well

12 as the agent who addressed the court, and the statement

13 made by the defendant.

14   But the reasons or justification for the

15 sentence, in addition to the nature of the offense,

16 the court considers that this is an offense that

17 occurred approximately four years ago, that the

18 defendant has been cooperating with the government

19 for that amount of time, for approximately four years.

20 The government has indicated on the record the amount

21 of cooperation defendant has given.

22   The court would just articulate the

23 cooperation resulted in apparently the conviction

24 of  the co-defendant who has been described as a

25 significant major drug player here on Guam.

1      Defendant also provided information that

2 resulted in the conviction of four drug importers and

3 three local Guam drug distributors, so 7 persons who

4 defendant was responsible for their conviction.

5      The court has also considered the defendant's

6 description of what life has been like during these

7 four years; he's described it as being scary, fear for

8 himself, fear for his family.  And those are factors

9 that the court takes in consideration as well.

10      One of the agents addressed the fact, or the

11 government's counsel, that it must be difficult to be

12 on the streets when you're cooperating in a small

13 community, others may be aware that you're cooperating,

14 and therefore, to some extent, it is -- your life is

15 in danger and the activity in which you're engaging is

16 dangerous activity.

17      The government made a statement that the court

18 thinks is significant, that obviously in sentencing as

19 we look at the disparity, we do look at the deterrence.

20 One of the things that we hope to accomplish by

21 sentencing, one, especially when we sentence to

22 custody, is that the message in the community will be

23 that if one engages in activity of this type, they are

24 likely to receive a long sentence, and we are hoping

25 that that means the community gets the message and it

1    will act as a deterrence.  Government also commented,

2    however, when one helps and assists with others being

3    arrested and convicted, that they do it of course to

4    some extent hoping that it will benefit them; and a

5    part of that message should be that when one assists to

6    the extent that this defendant has assisted, that one

7    should receive the benefit of what they were hoping to

8    accomplish.  For all those reasons, the court will

9    impose a probationary sentence.

10        Since the court is going to impose a

11   probationary sentence, I think it's probation's

12   recommendation that the period of probation be for

13   five years; am I correct?

14        PROBATION OFFICER GUILLIOTT:  Yes, Your Honor,

15   and it would be a term of supervised release, not

16   probation.

17        THE COURT:  That's right, because the court

18   does sentence the defendant to the custody of the

19   Bureau of Prisons for a period of 16 days.

20        PROBATION OFFICER GUILLIOTT:  Yes, Your Honor.

21        THE COURT:  He gets credit for the 16 days

22   that he's served, if that calculation is correct; then

23   upon release, defendant will be placed on supervised

24   release for a period of five years, under the following

25   terms and conditions.

1          PROBATION OFFICER GUILLIOTT:  Yes, Your Honor.

2          THE COURT:  One, the defendant is not to

3    commit another federal, state or local offense; two,

4    the defendant shall comply with the standard conditions

5    of supervised release set forth by the statute; three,

6    the defendant shall not possess a firearm or other

7    dangerous weapon.

8          Four, the defendant shall not use or possess

9    illegal controlled substances; five, the defendant

10   shall submit to the collection of a DNA sample at the

11   direction of probation; six, the defendant shall

12   refrain from the use of any and all narcotic beverages;

13   seven, the defendant shall submit to one drug test

14   within 15 days of release from custody, and two drug

15   tests thereafter.

16         And eight, the defendant shall participate

17   in a program approved by probation for assessment and

18   treatment of narcotic addiction or drug or alcohol

19   dependency, which will include testing for the

20   detection of substance use or abuse.

21         It's further recommended the defendant make

22   co-payment for treatment at a rate to be determined by

23   the U. S. Probation office.

24         Pursuant to 5E1.2(f) of the guidelines, all

25   fines are waived; the court finds defendant does not

1   have the ability to pay a fine. The court does order,

2   however, that the defendant pay a special assessment of

3   a hundred dollars; that is to be paid immediately after

4   sentencing.

5           And the court has set forth a justification

6   for the sentence, and therefore, all of the statements

7   previously made on this record are the reasons as to

8   why the court imposes this sentence. The court does

9   find it to be a reasonable sentence that the court has

10  indicated, and for that reason the court imposes the

11  sentence of credit for time served.

12          The court does advise the defendant of his

13  right to appeal from the imposition of sentence. If

14  defendant wishes to appeal, the court would order that

15  his present counsel file the notice for him, and it is

16  his responsibility to keep the Ninth Circuit advised

17  at all times of his current address.

18          Are there remaining counts or charges to be

19  dismissed?

20          MR. BLACK: Yes, we do move at this time, Your

21  Honor, to dismiss Counts 2 and 3 of the indictment.

22  The defendant in this case pled to the conspiracy

23  count, Count One, so we would move to dismiss Counts 2

24  and 3.

25          THE COURT: And the court does so order.

1          Is there anything further?

2          MR. TORRES:  No, Your Honor, thank you.

3          THE COURT:  All right, good luck.

4          MR. BLACK:  Thank you, Your Honor.

5          THE DEFENDANT:  Thank you, Your Honor.

6          (Whereupon proceedings concluded at 5:01 p.m.)

7                    *  *  *

8

9

10                  CERTIFICATE OF REPORTER

11

12   CITY OF AGANA      )
                        ) ss.
13   TERRITORY OF GUAM  )

14

15          I, Wanda M. Miles, Official Court Reporter

16   of the District Court of Guam, do hereby certify the

17   foregoing pages 1-43, inclusive, to be a true and

18   correct transcript of the shorthand notes taken by me

19   of the within-entitled proceedings, at the date and

20   times therein set forth.

21          Dated this 12th day of August, 2005.

22

23          _Wanda M. Miles_____

24

25